IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JAMES MICHAEL NAIVE #220963, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | NO. 3:19-cv-01132 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| BERT BOYD, Warden, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

James Michael Naive filed a pro se petition under 28 U.S.C. § 2254 for a writ of habeas corpus. (Doc. No. 1.) Respondent filed an Answer (Doc. No. 13), and Petitioner filed a Reply. (Doc. No. 16.) The Reply clarified certain claims and brought two new ones, so the Court liberally construed it as a motion to amend, granted such motion, and directed Respondent to file a Supplemental Answer. (Doc. No. 19.) Respondent complied. (Doc. No. 20.) For the following reasons, Petitioner is not entitled to relief under Section 2254, and this case will be dismissed.

## I.     Procedural Background

A Williamson County indictment charged Petitioner with first-degree murder. (Doc. No. 11-1 at 8.) Petitioner proceeded to trial, the jury convicted him as charged, and the court sentenced him to life with the possibility of parole. (*Id.* at 96.) The Tennessee Court of Criminal Appeals (TCCA) affirmed, and the Tennessee Supreme Court denied Petitioner's application for permission to appeal. *State v. Naive*, No. M2012-00893-CCA-R3CD, 2013 WL 4505395 (Tenn. Crim. App. Aug. 21, 2013), *perm. app. denied* Dec. 11, 2013.

Petitioner filed a post-conviction petition through counsel. (Doc. No. 11-22 at 48–68.) The court held an evidentiary hearing (Doc. No. 11-23) and denied relief. (Doc. No. 11-22 at 94–106.)

The TCCA affirmed, and the Tennessee Supreme Court denied discretionary review. *Naive v. State*, No. M2017-00278-CCA-R3-PC, 2018 WL 3814852 (Tenn. Crim. App. Aug. 10, 2018), *perm. app. denied* Jan. 15, 2020.

## II. Factual Background

On post-conviction appeal, the TCCA provided a concise summary of the evidence underlying Petitioner's conviction. The Court will set out that summary here as context for Petitioner's habeas claims and refer to more specific evidence as necessary in its analysis below:

> Petitioner had an on-going dispute with his sister over control of their elderly parents' bank account and physical care. On the afternoon of July 16, 2010, police responded to a call about a shooting at Petitioner's parents' residence. Petitioner had called 9-1-1 to report that he had accidentally shot his sister in the head. When officers arrived, Petitioner put his hands in the air and began walking towards the officers. Petitioner told the officers that he had shot his sister. Officers entered the residence and found the victim had been shot in the head. It appeared that the victim had been seated on an ottoman when she was shot and she had fallen backward onto the floor. Officers recovered a firearm from a rocking chair in the living room. The gun was fully loaded, except one round had been fired.

> Petitioner was taken into custody and interviewed by police. Petitioner's demeanor was calm, cooperative, and compliant. Petitioner told the lead investigator, Lieutenant William Ambrose, that his family owned the Brentwood residence where the shooting occurred and a large farm in Shelbyville. Petitioner had been caring for his elderly parents. Petitioner told Lieutenant Ambrose that the victim had "invaded" his parents' residence and "broke[n] into the bank accounts." About the incident, Petitioner told him that his sister "starts with [their father,] and he starts screaming . . . you're killing me, y'all are killing me, y'all are killing me. So I walked upstairs and killed her."

*Naive*, 2018 WL 3814852, at *1.

## III. Claims

Because Petitioner is representing himself, the Court has liberally construed the Petition (Doc. No. 1) and the Reply (Doc. No. 16) to the fullest practicable extent. *See MacLloyd v. United States*, 684 F. App'x 555, 558 (6th Cir. 2017) ("'The allegations of a pro se habeas petition . . . are entitled to a liberal construction,' which may 'require[] active interpretation in some cases to

construe a pro se petition to encompass any allegation stating federal relief.'") (quoting *Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985)). In so doing, the Court understands Petitioner to assert the following claims, which the Court has reorganized for clarity:

1.      The trial court erred by:

   A.      Being biased against Petitioner (Doc. No. 1 at 16);

   B.      Denying Petitioner's motion to suppress statements made to police (*id.* at 18; Doc. No. 16 at 2, 7, 23–31); and

   C.      Giving an improper jury instruction. (Doc. No. 16 at 7, 41–50.)

2.      Trial counsel was ineffective for failing to:[1]

   A.      Represent Petitioner properly due to a conflict of interest (Doc. No. 1 at 11);

   B.      Interview two witnesses to the shooting (Petitioner's parents) (*id.* at 12, 14–16, 18; Doc. No. 16 at 2, 7, 31–41);

   C.      Obtain further testing of the victim (Doc. No. 1 at 11);

   D.      Meet the standard of assistance set forth in *United States v. Cronic*, 466 U.S. 648 (1984) (*id.* at 12);

   E.      Advise the trial court that the jury may not have heard all of the evidence and been instructed on the applicable law (*id.* at 11);

   F.      Move to suppress a range of evidence before trial (*id.* at 11–12); and

   G.      Convince Petitioner not to testify despite pursuing a trial strategy that required Petitioner's testimony. (*Id.* at 12, 14–16, 18; Doc. No. 16 at 2, 7, 11–22.)

---

[1] The Petition and Reply primarily refer to a singular "counsel" or "trial counsel" when discussing Petitioner's ineffective-assistance-of-trial-counsel claims. (*See* Doc. No. 1 at 11–16, 18; Doc. No. 16 at 2, 5, 7, 11–18, 22, 31–33, 36–40.) As Petitioner recognizes, however, he was represented by two attorneys at trial. (Doc. No. 1 at 17; Doc. No. 16 at 18.) Both attorneys testified at Petitioner's post-conviction hearing, and the TCCA distinguished between them as "trial counsel" and "co-counsel" on post-conviction appeal. *Naive*, 2018 WL 3814852, at *1. This Court will use the same labels where necessary to discuss each attorney's testimony below. Otherwise, because Petitioner does not meaningfully distinguish between the representation provided by trial counsel and co-counsel when discussing his ineffective-assistance-of-trial-counsel claims, any reference to a singular attorney in the Court's analysis of these claims applies to the collective performance of both attorneys.

3.      Appellate counsel was ineffective. (Doc. No. 1 at 13.)

4.      Post-conviction counsel was ineffective. (*Id.* at 9, 12.)

5.      Cumulative error. (Doc. No. 16 at 7–8, 50–58.)

6.      Actual innocence. (Doc. No. 1 at 15–16, 19.)

## IV.     Legal Standard

Federal habeas relief for state prisoners is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Harrington v. Richter*, 562 U.S. 86, 97 (2011). AEDPA establishes a demanding standard for granting federal relief on claims "adjudicated on the merits" in state court. 28 U.S.C. § 2254(d). Under AEDPA, such a claim cannot be the basis for federal relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it

"incorrect or erroneous"; instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)).

To grant relief under Section 2254(d)(2), a federal court must find that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations are unreasonable only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)). "[I]t is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011) (citing *Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011)).

Review of claims rejected on the merits in state court, however, is ordinarily available only to petitioners who "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). In Tennessee, a petitioner is "deemed to have exhausted all available state remedies for [a] claim" when it is presented to the TCCA. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39). "To be properly exhausted, each claim must have been 'fairly presented' to the state courts," meaning that the petitioner presented "the same claim under the same theory . . . to the state courts." *Wagner v. Smith*, 581 F.3d 410, 414, 417 (6th Cir. 2009) (citations omitted).

Under the procedural default doctrine, "a federal court may not review federal claims that . . . the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (citations omitted). A claim also may be "technically

exhausted, yet procedurally defaulted" where "a petitioner fails to present a claim in state court, but that remedy is no longer available to him." *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015) (citing *Jones v. Bagley*, 696 F.3d 475, 483–84 (6th Cir. 2012)).

To obtain review of a procedurally defaulted claim, a petitioner must "establish 'cause' and 'prejudice,' or a 'manifest miscarriage of justice.'" *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1134 (6th Cir. 2016) (citing *Sutton v. Carpenter*, 745 F.3d 787, 790–91 (6th Cir. 2014)). Cause may be established by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Davila*, 137 S. Ct. at 2065 (citations omitted). Prejudice requires a showing that the errors at trial worked to a petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Garcia-Dorantes v. Warren*, 801 F.3d 584, 598 (6th Cir. 2015) (quoting *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991)) (internal quotation marks omitted). And the manifest-miscarriage-of-justice exception applies "where a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense." *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## V.    Analysis

Respondent argues that Petitioner's claims are not cognizable, without merit under AEDPA's demanding standard of review for claims adjudicated on the merits in state court, or procedurally defaulted without cause.[2] (Doc. No. 13 at 18–35; Doc. No. 20 at 19–40.) The Court will address each category of claims in turn.

---

[2] Respondent also argues that the two new claims asserted in Petitioner's Reply—the claim of trial court error asserted in Claim 1.C and the claim of cumulative error asserted in Claim 5—are untimely. (Doc. No. 20 at 37–40.) "Because the statute of limitations does not constitute a jurisdictional bar to habeas review, a federal court" can resolve a habeas petition on grounds other than timeliness "in the interest of judicial economy." *Mateo-Castellanos v. Rapelje*, No. 2:11-CV-13761, 2012 WL 1555210, at *2 (E.D. Mich. May

A.      Non-Cognizable

A federal court can grant a state prisoner's request for habeas relief "only on the ground that he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). A ground for relief that does not assert a violation of federal law, therefore, is "outside the scope of federal habeas corpus review." *See Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007) (citations omitted). Four claims—Claims 1.C, 4, 5, and 6—will be denied for this reason.

1.      *Claim 1.C—Improper Jury Instruction*

In Claim 1.C, Petitioner asserts that the trial court's jury instruction on "Defense of a Third Person" was improper because it was inconsistent with the jury instruction on "Cause of Death." (Doc. No. 16 at 41, 43.)[3] "In general, the fact that a jury instruction was allegedly incorrect under state law is not a basis for federal habeas relief." *Ambrose v. Romanowski*, 621 F. App'x 808, 813 (6th Cir. 2015) (citing *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991)). "To be cognizable in a federal habeas proceeding, an error in a state court's jury instructions must be so egregious that it deprives the petitioner of a fundamentally fair trial." *Roberts v. Klee*, No. 21-1594, 2022 WL 5287808, at *2 (6th Cir. July 12, 2022) (quoting *Wade v. Timmerman-Cooper*, 785 F.3d 1059, 1078 (6th Cir. 2015)). The Supreme Court has "defined the category of infractions that violate

---

1, 2012) (citing *Smith v. State of Ohio Dep't of Rehab.*, 463 F.3d 426, 429 n.2 (6th Cir. 2006)). Here, it is more efficient for the Court to bypass the timeliness issue and instead resolve Claim 1.C and Claim 5 on other grounds, as discussed below.

[3] Petitioner asks this Court to review the instructions in question under Federal Rule of Criminal Procedure 52(b). (Doc. No. 16 at 7.) But as Respondent rightly notes, the Federal Rules of Criminal Procedure do not apply in federal habeas proceedings, which are civil in nature. (Doc. No. 20 at 39); *United States v. Asakevich*, 810 F.3d 418, 422 (6th Cir. 2016) ("[B]oth the Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure apply in § 2255 proceedings, while only the Federal Rules of Civil Procedure apply in § 2254 proceedings."). So the Court is constrained to consider only whether the allegedly improper jury instructions referenced in Claim 1.C can provide a basis for federal habeas relief, not whether they complied with the Federal Rules of Criminal Procedure.

'fundamental fairness'" in this context "very narrowly." *Estelle v. McGuire*, 502 U.S. 62, 73 (1991) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

Petitioner has not established that the trial court's jury instructions were incorrect, much less that the instructions included an error so egregious as to render his trial fundamentally unfair. The Cause of Death instruction explained the State's burden of proof to convict Petitioner "of any degree of homicide," including that "the State must have proven beyond a reasonable doubt that the death of the deceased was proximately caused by the criminal conduct of the defendant." (Doc. No. 11-11 at 40.) And the Defense of Third Person instruction explained the standard for the jury to use when determining whether Petitioner's use of force was justified to protect a third person.[4] (*Id.* at 42–46.) These instructions are not inconsistent; a defendant's conduct can proximately cause another's death and yet be, in certain well-defined circumstances, legally justified to protect a third person. One scenario does not preclude the other. Accordingly, Petitioner's challenge to the jury instructions via Claim 1.C does not provide a basis for federal habeas relief.

2.     *Claim 4—Ineffective Assistance of Post-Conviction Counsel*

In Claim 4, Petitioner asserts that post-conviction counsel was ineffective. (Doc. No. 1 at 9, 12.) As a stand-alone basis for habeas relief, this claim is barred by statute and long-standing precedent. 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal

---

[4] Defense of Third Person is a "general defense" that a Tennessee court must submit to the jury if "it is 'fairly raised by the proof.'" *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (quoting Tenn. Code Ann. § 39-11-203(c) (2010)). Tennessee law distinguishes between general defenses and affirmative defenses, such that an affirmative defense "(1) require[s] pre-trial notice, and (2) once 'fairly raised' and submitted to the jury, must be proven by the defendant by a preponderance of the evidence." *Id.* at 129 n.9 (quoting Tenn. Code Ann. §§ 39-11-203, -204). By contrast, when a general defense is submitted to the jury, the State has the burden "to prove beyond a reasonable doubt that the defense does not apply." *Id.* at 129 (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). Here, the trial court accurately described the State's burden when it gave the Defense of Third Person instruction. (*See* Doc. No. 11-11 at 46 ("If evidence is introduced supporting a defense of a third person[,] the burden is on the State to prove beyond a reasonable doubt that the defendant did not act in defense of a third person.").)

or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.") (citations omitted). Claim 4 will be denied for this reason.

The Court recognizes that ineffective assistance of post-conviction counsel may, in some circumstances, establish the "cause" necessary "to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez v. Ryan*, 566 U.S. 1, 17 (2012). This rule is subject to several limitations, including that post-conviction ineffectiveness can serve only as "cause to overcome the default of a single claim—ineffective assistance of trial counsel." *Davila*, 137 S. Ct. at 2062–63 (discussing *Martinez*, 566 U.S. 1; *Trevino v. Thaler*, 569 U.S. 413 (2013)). Therefore, the Court will consider Petitioner's assertion of post-conviction ineffectiveness as an allegation of cause regarding his defaulted claims of ineffective assistance of trial counsel, as discussed below. *See* Section V.C.2.

3. *Claim 5—Cumulative Error*

In Claim 5, Petitioner asserts that he is entitled to habeas relief based on the cumulative effect of errors at trial. (Doc. No. 16 at 7–8, 50–58.) Binding Sixth Circuit authority holds that "cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)); *see also Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011). [5] So Claim 5 is not a viable ground for relief in this proceeding.

---

[5] Recent unpublished Sixth Circuit opinions have cast some doubt on this holding. *See, e.g.*, *Teats v. Genovese*, No. 22-5365, 2022 U.S. App. LEXIS 30775, at *9–10 (6th Cir. Nov. 4, 2022) ("Jurists of reason could disagree as to whether Teats's eighth claim, alleging cumulative error by trial and appellate counsel,

Alternatively, even if Claim 5 were cognizable, "if the individual claims making up the cumulative error claim are procedurally barred or without merit, the cumulative error claim 'must also fail.'" *Heckathorn v. Baldauf*, No. 4:20 CV 2820, 2022 WL 171540, at *4 (N.D. Ohio Jan. 19, 2022) (quoting *Ramsey*, 2020 WL 9423257, at *3). For the reasons stated throughout this Memorandum Opinion, that is the case here.

### 4. Claim 6—Actual Innocence

In Claim 6, Petitioner asserts that he is actually innocent of first-degree murder. (Doc. No. 1 at 15–16, 19.) The Sixth Circuit has "repeatedly indicated" that freestanding actual innocence claims "are not cognizable on habeas" review. *Smith v. Nagy*, 962 F.3d 192, 207 (6th Cir. 2020) (citing *Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007)). Accordingly, Claim 6 will be denied.

Although "a proper showing of actual innocence" may allow "a prisoner whose claim may otherwise be barred by various federal or state procedural rules" to "'have his federal constitutional claim considered on the merits,'" *Penney v. United States*, 870 F.3d 459, 462 (6th Cir. 2017) (quoting *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013)), Petitioner has not made such a showing here. This gateway to review "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *McQuiggin*, 569 U.S. at 395 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). A petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005) (quoting *Schlup*, 513 U.S. at 324).

---

is cognizable on habeas review."); *Ramsey v. Phillips*, No. 20-3452, 2020 WL 9423257, at *3 (6th Cir. Nov. 4, 2020) ("It is less clear whether jurists of reason could disagree with the district court's determination that Ramsey's fourth claim, in which he alleges cumulative error, is not cognizable on habeas review."). However, it does not appear that the Sixth Circuit has revisited this holding or that the Supreme Court has since contradicted it, so the Court is bound to apply it.

Petitioner supports his actual innocence argument with speculation that further trial testimony would have convinced the jury that Petitioner's shooting of his sister was accidental, justified, or some combination of both. (*See* Doc. No. 1 at 15, 19.) This speculation is not new evidence. Moreover, "actual innocence means factual innocence, not mere legal insufficiency." *Souter*, 395 F.3d at 590 (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). Therefore, a petitioner convicted of murder cannot make a proper claim of actual innocence by relying on evidence that the killing was justified or that he should have been convicted of a lesser-degree offense. *See Harvey v. Jones*, 179 F. App'x 294, 298–99 (6th Cir. 2006) (explaining that "new evidence" supporting self-defense theory did not show petitioner was "factually innocent of killing [the victim]"); *Taylor v. Winn*, No. 20-1359, 2020 WL 4334125, at *1, 3 (6th Cir. July 13, 2020) (holding that "reasonable jurists would not debate" that petitioner convicted of first-degree felony murder made no "showing of actual innocence" where "he admitted that he was guilty of at least voluntary manslaughter") (citations omitted); *Brickey v. Smith*, No. 12-14028, 2013 WL 4029050, at *6 (E.D. Mich. Aug. 7, 2013) ("[N]ewly discovered evidence that would merely lower the degree of offense does not establish an actual innocence claim.") (collecting cases). Accordingly, Petitioner cannot excuse the procedural default of any claims based on actual innocence.

B.    <u>Adjudicated on the Merits</u>

Petitioner exhausted Claims 1.B and 2.G in state court.

1.    *Claim 1.B—Motion to Suppress Statements to Police*

Lt. William Ambrose questioned Petitioner while he was in custody at the police station shortly after Petitioner's arrest. Ambrose began this questioning without administering *Miranda*[6]

---

[6] In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements

warnings. This was in line with Ambrose's "habit to start his police interviews with basic, 'getting-to-know-you' questions prior to giving *Miranda* warnings." *Naive*, 2013 WL 4505395, at *2. During pre-*Miranda* questioning, Petitioner twice admitted to shooting his sister. First, answering a question about who lived at the residence where the shooting occurred, Petitioner said, "[m]y sister, the girl I shot, comes by." *Id.* Ambrose "did not address this statement but instead continued his general questioning." *Id.* And later, during an exchange that began with Ambrose's asking how long Petitioner's sister had been staying at the residence, Petitioner gave an extended answer that ended with his saying, "So I walked upstairs and killed her." *Id.* at *2–3. The following exchange then occurred:

> Ambrose: Whoa, now, Mr. Naive.
>
> Defendant: I'm all right. I'm sorry.
>
> Ambrose: That's all right, that's all right. Just take a minute. Just calm down. Get you a drink of water.
>
> Defendant: What have I done?
>
> Ambrose: Um now, when we start talking about your sister, here is where we need to stop for a moment. Um, this is at the point in time where I have to read you your rights.
>
> Defendant: Yes, sir, I understand.

*Id.* at *3. Ambrose then administered *Miranda* warnings, Petitioner signed a waiver of his rights, and Petitioner gave a detailed explanation of the events leading to the shooting. *Id.*

Before trial, Petitioner filed a motion to suppress the pre- and post-*Miranda* statements confessing to shooting his sister, arguing that they should not be admitted because Lt. Ambrose did not administer proper *Miranda* warnings. (Doc. No. 11-1 at 42–43.) The trial court held a

---

obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (discussing *Miranda*, 384 U.S. 436) (plurality opinion) (footnote omitted).

hearing on the motion, heard testimony from Ambrose and argument from the parties, and denied the motion in full. (Doc. No. 11-4 at 5–12, 15–22, 24–26 (Ambrose testimony); *id.* at 57–67, 70–71 (argument); Doc. No. 11-5 at 23–25 (argument); *id.* at 25–28 (oral ruling); Doc. No. 11-1 at 48–49 (written ruling).) At trial, the court accordingly admitted Petitioner's pre- and post-*Miranda* statements *See Naive*, 2013 WL 4505395, at *2–4.

On direct appeal, Petitioner challenged the admission of his pre- and post-*Miranda* statements. The TCCA held that it was improper to admit Petitioner's pre-*Miranda* statement, but that this admission was "harmless beyond a reasonable doubt" because Petitioner made "admissions of guilt prior to his arrest" and because it was proper to admit his "full post-*Miranda* confession." *Naive*, 2013 WL 4505395, at *13. The TCCA's ruling, therefore, had two components: a harmlessness ruling regarding Petitioner's pre-*Miranda* statement, and an admissibility ruling regarding Petitioner's post-*Miranda* statement. Petitioner challenges both components of this ruling, in Claim 1.B. (Doc. No. 1 at 18; Doc. No. 16 at 2, 7, 23–31.) The TCCA ruled on the merits, so AEDPA deference applies. *See* 28 U.S.C. § 2254(d).

Because the post-*Miranda* admissibility ruling is part of the rationale for the pre-*Miranda* harmlessness ruling, the Court will first address the admissibility ruling. The Court therefore begins its analysis by identifying "the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs" Petitioner's challenge to the post-*Miranda* admissibility ruling. *See Marshall v. Rodgers*, 569 U.S. 58, 61 (2013) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).

Petitioner points the Court to *Missouri v. Seibert*, 542 U.S. 600 (2004), where five justices agreed that a police officer's mid-interview *Miranda* warnings should have resulted in suppression of a defendant's post-*Miranda* statement. (*See* Doc. No. 16 at 23–31); *Seibert*, 542 U.S. at 607. A

habeas court in the Sixth Circuit, however, cannot treat *Seibert* as clearly establishing a governing rule for Petitioner's claim. *See Mitchell v. MacLaren*, 933 F.3d 526, 539 (6th Cir. 2019) ("*Seibert* did not establish a clear rule for determining when such confessions are inadmissible."); *Curry v. Klee*, 723 F. App'x 271, 273 (6th Cir. 2017) ("[W]e have already held that *Seibert* did not create a binding rule for purposes of habeas review.") (citing *United States v. Ray*, 803 F.3d 244, 272 (6th Cir. 2015)). Instead, for habeas purposes, *Seibert* "established only that on the facts of that case, the post-warning confession was inadmissible."[7] *Mitchell*, 933 F.3d at 537 (citing *Bobby v. Dixon*, 565 U.S. 23, 30–32 (2011)).

Therefore, "[t]o understand the applicable Supreme Court case law" in this area, the Court must look elsewhere. The Court concludes that it must consider, in particular, one case decided before *Seibert* (*Oregon v. Elstad*, 470 U.S. 298 (1985)), and one decided after *Seibert* (*Bobby v. Dixon*, 565 U.S. 23 (2011)). *See Mitchell*, 933 F.3d at 536–38. The Sixth Circuit has discussed *Elstad*, *Seibert*, and *Dixon* as follows:

> In *Elstad*, the police went to the suspect's house to take him into custody on a charge of burglary. [470 U.S.] at 300. Before the arrest, one officer spoke with the suspect's mother while the other officer joined the suspect in the living room, *id.* at 300–01, where the officer said he "felt" the suspect was involved in a burglary, *id.* at 301. The suspect said, "Yes, I was there." *Id.* [FN: The state conceded for the

---

[7] The Sixth Circuit decided as much based on the unique structure of the Supreme Court's fractured decision in *Seibert*. Among the five justices voting for suppression, four joined a plurality opinion adopting a five-factor test aimed to determine whether mid-interview warnings were effective enough to accomplish the object of *Miranda*. 542 U.S. at 615–16. Justice Kennedy "provided the fifth vote" for the result but wrote "separately to propose an alternative analysis." *Mitchell*, 933 F.3d at 537. "Generally, when there is no majority opinion, the narrowest opinion adhered to by at least five Justices controls." *Ray*, 803 F.3d at 270 (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)). But the Sixth Circuit held that Justice Kennedy's concurrence was not narrower than the plurality opinion, so there was no common denominator among the five justices voting for suppression, and no opinion "announce[d] a binding rule of law with respect to the admissibility standard for statements given subsequent to midstream *Miranda* warnings." *Id.* at 271–72 (citations omitted). This Court is bound by the Sixth Circuit's decision on the existence (or lack) of clearly established Supreme Court precedent on a relevant topic. *See McCalvin v. Yukins*, 444 F.3d 713, 721 (6th Cir. 2006) ("Although only Supreme Court case law is relevant under AEDPA in deciding what federal law is clearly established, lower federal court decisions may be used to the extent we have already reviewed and interpreted the relevant Supreme Court law.") (citing *Hill v. Hofbauer*, 337 F.3d 706, 716 (6th Cir. 2003)).

purposes of the appeal that the suspect was in custody at the time of this exchange. *See Elstad*, 470 U.S. at 315.] Later, at the station house, the suspect was given *Miranda* warnings, and he made a full confession. *Id.* at 301–02.

The *Elstad* Court reasoned that "a simple failure to administer the [*Miranda*] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," does not automatically "taint[ ] the investigatory process." *Id.* at 309. "[T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second [i.e., the *Mirandized*] statement was also voluntarily made." *Id.* at 318 (footnote omitted). "[A] suspect who has once responded to unwarned [i.e., un-*Mirandized*] yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." *Id.*

After *Elstad* came *Seibert*[.] There, police questioning led to the defendant's confession to a crime, after which she was given a 20-minute break. *Seibert*, 542 U.S. at 604–05 (plurality opinion). Following the break, the officer turned on the tape recorder and only then gave the defendant her *Miranda* warnings. *Id.* at 605. When the defendant resisted making a statement, the officer reminded her that she had already admitted involvement in the crime; the defendant then confessed post-warning. *Id.* In a fractured decision, the Supreme Court held that the post-warning confession was inadmissible.

*Mitchell*, 933 F.3d at 536–37.

After *Seibert* came *Dixon*:

In *Dixon*, both Dixon and another man murdered the victim. 565 U.S. at 24–25. Dixon then used the victim's social security card and birth certificate to obtain a state identification card in the victim's name so Dixon could sell the victim's car. *Id.* at 25. Police arrested Dixon on a forgery charge and then questioned him intermittently over several hours but intentionally declined to provide Dixon with *Miranda* warnings. *Id.* Dixon admitted to forging the victim's signature, but he denied having any involvement in the victim's disappearance. *Id.* After Dixon's accomplice spoke to police officers and led them to where the two had buried the body, officers again brought Dixon to the station, about four hours after the initial intermittent questioning had concluded. *Id.* at 26. "Dixon stated that he had heard the police had found a body and asked whether [his accomplice] was in custody. The police told Dixon that [the accomplice] was not, at which point Dixon said, 'I talked to my attorney, and I want to tell you what happened.'" *Id.* After the officers advised him of his *Miranda* rights, Dixon admitted to murdering the victim. *Id.*

Ultimately, Dixon's case reached the Supreme Court in the form of an appeal from the denial of his § 2254 petition. The Court, citing both *Elstad* and *Seibert*, held:

> In this case, no two-step interrogation technique of the type that concerned the Court in *Seibert* undermined the *Miranda* warnings Dixon received. In *Seibert*, the suspect's first, unwarned interrogation left "little, if anything, of incriminating potential left unsaid," making it "unnatural" not to "repeat at the second stage what had been said before."

*Id.* at 31 (quoting *Seibert*, 542 U.S. at 616–17 (plurality opinion)). Accordingly, the Court continued:

> [A]dmission of Dixon's murder confession was consistent with this Court's precedents: Dixon received *Miranda* warnings before confessing to [the] murder; the effectiveness of those warnings was not impaired by the sort of "two-step interrogation technique" condemned in *Seibert*; and there is no evidence that any of Dixon's statements was the product of actual coercion. *Id.* at 32.

*Mitchell*, 933 F.3d at 538.

In sum, as interpreted by the Sixth Circuit, *Elstad* and *Dixon* collectively establish "that mid-stream warnings do not necessarily make a post-warning confession inadmissible." *Mitchell*, 933 F.3d at 539. And *Seibert* "did not establish a clear rule for determining when such confessions are inadmissible." *Mitchell*, 933 F.3d at 539. In habeas cases, therefore, the Court is left to determine whether a state court unreasonably applied the holding of *Elstad*, as reaffirmed by *Dixon*, which is that "there is no warrant for presuming coercive effect [as to the defendant's second, warned statement] where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. The relevant inquiry is whether, in fact, the second [warned] statement was also voluntarily made." *Mitchell*, 933 F.3d at 539 (quoting *Dixon*, 565 U.S. at 29); *see also Curry*, 723 F. App'x at 273 (describing the "usual rule" established by *Elstad* to be "that the defendant's post-warning statements are admissible so long as the defendant was not coerced before or after he received the warnings" (citing *Elstad*, 470 U.S. at 307, 318)); *Hill*, 792 F.3d at 676 (discussing the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1)). One caveat to this analysis is that *Seibert* remains relevant precedent so long as it is confined to its particular

facts. *See Mitchell*, 933 F.3d at 537. A habeas petitioner might gain relief based on *Seibert*, then, if a state court confronted facts that were materially indistinguishable from *Seibert* and came to a different result. *See Hill*, 792 F.3d at 676 (discussing the "contrary to" clause of 28 U.S.C. § 2254(d)(1)).

With these principles in mind, the Court turns to the TCCA's ruling on the admissibility of Petitioner's post-*Miranda* statement (which, as *Elstad* and *Dixon* instruct, also requires consideration of the voluntariness of Petitioner's pre-*Miranda* statement). The TCCA ruled that Petitioner's pre- and post-*Miranda* statements were all voluntary, and that "[t]here [was] no evidence that Lieutenant Ambrose, in any way, coerced a confession from the defendant" following the *Miranda* warnings. *Naive*, 2013 WL 4505395, at *13. The TCCA based this conclusion on several sets of circumstances, including the fact(s) that: after the shooting but before Petitioner was in custody, he voluntarily confessed to shooting the victim to the 9-1-1 operator, his daughter, and police officers who arrived on the scene; the inculpatory portions of Petitioner's pre-*Miranda* statement were "completely spontaneous and non-responsive to Lieutenant Ambrose's questions"; "[t]he pre-*Miranda* portion of the interview lasted approximately ten minutes and provided little detail about the crime itself, whereas the detailed, post-*Miranda* interview lasted more than one hour and 15 minutes"; Petitioner was not deprived of any basic needs during the questioning; when Ambrose went over the *Miranda* waiver form with Petitioner, Petitioner told "Ambrose, in no uncertain terms, that [Petitioner] wished to talk to [Ambrose]"; and during Ambrose's explanation of the *Miranda* waiver form, Petitioner affirmed that he was sober, "and his education and intelligence level adequately conveyed that he understood his rights and knowingly waived them." *Id.*

This Court has reviewed the entire recording of Petitioner's pre- and post-*Miranda* statements, and the TCCA's characterization of the facts as it pertains to these statements is supported by the record. (*See* Respondent's Exhibit Manually Filed Mar. 20, 2020, Suppression Hearing Exhibit 3 ("Interrogation Video").)[8] As for the TCCA's legal conclusion on the admissibility of Petitioner's post-*Miranda* statement, "the precise contours of [a defendant's] right remain unclear" in so-called "*Miranda*-in-the-middle" cases like this one. *See McKinney v. Hoffner*, 830 F.3d 363, 372 (6th Cir. 2016) (quoting *Woods v. Donald*, 575 U.S. 312, 318 (2015)); *Mitchell*, 933 F.3d at 536–39 (carefully parsing the applicable clearly established federal law on this issue). Under AEDPA, therefore, the TCCA "enjoy[ed] broad discretion in [its] adjudication

---

[8] The TCCA's statement that the post-*Miranda* interview lasted "more than one hour and 15 minutes" includes a total of about 22 minutes when Petitioner was not being questioned because Ambrose had left the room. (*See* Interrogation Video, post-*Miranda* questioning beginning around 16:25:00 and ending around 17:37:40, with breaks from about 16:51:30 to 16:54:40, 17:01:30 to 17:03:00, and 17:05:00 to 17:22:30.) This does not render the TCCA's factual determination on this point objectively unreasonable, and regardless, the TCCA did not base its post-*Miranda* admissibility ruling on the precise length of the post-*Miranda* questioning. *See Rice*, 660 F.3d at 250 (discussing the standard for obtaining relief under 28 U.S.C. § 2254 (d)(2)).

Despite Petitioner's suggestion to the contrary (discussed in this footnote below), it was also a reasonable determination of the facts for the TCCA to find that Petitioner told Ambrose "in no uncertain terms" that Petitioner wished to talk. *See* 28 U.S.C. § 2254(d)(2). The recording reflects as follows: after Ambrose went over the *Miranda* waiver form and asked Petitioner if he was willing to talk, Petitioner stated, "I'd really like to talk to you but if I sign that, that says that whatever I say can be held against me." Then, as part of the same sentence and within the same breath, Petitioner slightly stumbled over his words as if he was considering that prospect, before saying, "yeah I will talk to you." Soon thereafter, Petitioner asked for clarification that signing the form would not prevent him from being appointed a lawyer. Ambrose said no, and Petitioner affirmed that he understood the waiver to mean that he "can talk to you now without one. We ain't gotta wait." Petitioner then signed the form. Meanwhile, Ambrose reiterated that Petitioner was free to stop talking at any time. Petitioner responded with sounds that are indiscernible from the recording (transcribed by the TCCA on direct appeal as "inaudible," *Naive*, 2013 WL 4505395, at *12). (Interrogation Video, beginning at 16:23:37.)

In the Reply, Petitioner asserts that his response to Lt. Ambrose at the end of the *Miranda* waiver exchange was not indiscernible, but rather that the recording "clearly shows" that he says, "If it can't be used against me." (Doc. No. 16 at 26.) Upon close review of the recording, the Court disagrees. These sounds, it seems to the Court, were not directed toward Ambrose, as Petitioner briefly bowed his head, clasped his hands, and did not project the sounds outward. Regardless, the sounds are indeed indiscernible. (Interrogation Video at 16:24:52.)

of [this] claim." *Id.* (quoting *Woods*, 575 U.S. at 318). And applying AEDPA deference, the Court cannot say that it was objectively unreasonable for the TCCA to conclude that Petitioner's pre- and post-*Miranda* statements were voluntary.

"The failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised." *Elstad*, 470 U.S. at 310 (citations omitted). A fairminded jurist could easily conclude that Lt. Ambrose's pre-*Miranda* questioning was unaccompanied by actual coercion. *See id.* at 312 (noting the difference between "coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will" and "disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question"). As for the presumption of coercion created by carrying pre-*Miranda* questioning directly into post-*Miranda* questioning, it is certainly striking that Ambrose readily admitted employing the same two-step interrogation technique that faced scrutiny in *Seibert*.[9] But

---

[9] The *Seibert* plurality described the object of a two-step interrogation technique as follows:

> [T]he reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran v. Burbine*, 475 U.S. 412, 424 (1986).

*Seibert*, 542 U.S. at 613–14 (footnote omitted).

Ambrose's pre-*Miranda* questioning was different than the questioning in *Seibert* because Petitioner had already voluntarily confessed multiple times to shooting his sister before he was taken into custody and interrogated. This unique context could lead a fairminded jurist to conclude that Ambrose did not undermine *Miranda* by using pre-warning questioning to extract a post-warning confession, and thus did not prevent Petitioner from voluntarily waiving his *Miranda* rights. *See Elstad*, 470 U.S. at 309 ("It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period."). And without a presumption of coercion carrying over from the initial unwarned questioning, a fairminded jurist could also conclude that Petitioner's post-*Miranda* statement was voluntary. Accordingly, it was not an unreasonable application of clearly established federal law for the TCCA to determine that the trial court properly admitted Petitioner's post-*Miranda* statement.

Petitioner argues that he is entitled to habeas relief because this case is "materially indistinguishable" from *Seibert*. (*See* Doc. No. 16 at 23, 31); *Hill*, 792 F.3d at 676 (discussing the "contrary to" clause of 28 U.S.C. § 2254(d)(1)). But Petitioner's facts are distinguishable in material respects. The most significant distinction is that, as discussed above, Petitioner voluntarily confessed multiple times before he was taken into custody, fundamentally altering the context of Lt. Ambrose's pre-*Miranda* questioning as compared to *Seibert*.

A material distinction is further indicated by the differences between the specific manner of Lt. Ambrose's questioning and the questioning in *Seibert*. In *Seibert*, a police officer questioned the suspect "without *Miranda* warnings for 30 to 40 minutes, squeez[ed] her arm," and repeated a

pointed statement clearly intended to solicit a confession ("Donald was also to die in his sleep."). 542 U.S. at 604–05. The suspect finally confessed, and there was a 20 minute break. *Id.* at 605. The officer then administered *Miranda* warnings and led the suspect to repeat her confession by confronting her with her pre-*Miranda* statement. *Id.* at 605. Justice Kennedy remarked that "[t]he postwarning interview resembled a cross-examination." *Id.* at 621 (Kennedy, J., concurring). Not so here. Ambrose's pre-*Miranda* questioning lasted about 10 minutes, Ambrose did not apply any kind of physical pressure to Petitioner, and he asked context-framing questions rather than questions specifically "designed to elicit a confession." *See Naive*, 2013 WL 4505395, at *7, 14 (noting that Ambrose's pre-*Miranda* questions included asking Petitioner "who was currently living at the Brentwood residence" and "how long the victim had been staying at the Brentwood residence"). Ambrose's post-*Miranda* questioning also did not involve confronting Petitioner with his pre-*Miranda* statement; rather, post-*Miranda*, Ambrose asked open-ended, non-confrontational questions, and Petitioner responded by giving extended answers. (*See* Interrogation Video, post-*Miranda* interview beginning around 16:25:00.) Taken together, the facts of Petitioner's case are materially distinguishable from *Seibert*. The trial court's admission of Petitioner's post-*Miranda* statement, therefore, is not a basis for federal habeas relief.

That leaves the admission of Petitioner's pre-*Miranda* statement. As stated above, the TCCA ruled that admission of this statement was harmless, given Petitioner's "admissions of guilt prior to his arrest" and the proper admission of Petitioner's post-*Miranda* confession. *Naive*, 2013 WL 4505395, at *13. Because the post-*Miranda* admissibility ruling was not objectively unreasonable, the harmlessness ruling was clearly reasonable. That is, Petitioner's non-custodial confessions and his post-*Miranda* statement are "ample evidence" of his guilt, regardless of the pre-*Miranda* statement. *See Casanova v. Campbell*, No. 22-1394, 2022 WL 16635440, at *6 (6th

Cir. Oct. 12, 2022) (applying AEDPA deference to state court determination that admission of a statement in violation of *Miranda* was harmless because there was other "ample evidence presented at trial that established [Petitioner's] guilt"); *Curry*, 723 F. App'x at 273 (holding that, because the habeas court "lack[ed] authority to hold that the state court unreasonably admitted [Petitioner's] post-warning statements at trial," "the [trial] court's admission of his pre-warning statements was largely cumulative and thus not a basis for habeas relief") (citing *Ruelas v. Wolfenbarger*, 580 F.3d 403, 413 (6th Cir. 2009)).

For all of these reasons, Petitioner's challenge to the state court's resolution of his motion to suppress statements to police (Claim 1.B) will be denied.

### 2. *Claim 2.G—Trial Counsel's Advice on Petitioner Testifying*

In Claim 2.G, Petitioner asserts that trial counsel provided ineffective assistance by convincing Petitioner not to testify despite pursuing a strategy that required Petitioner's testimony—that strategy being to convince the jury that Petitioner shot his sister to protect his father. (Doc. No. 1 at 12, 14–16, 18; Doc. No. 16 at 2, 7, 11–22.) The TCCA denied this claim on the merits. *See Naive*, 2018 WL 3814852, at *5–6 (addressing claim that "counsel was ineffective for failing to allow Petitioner to testify at trial to establish that Petitioner was acting in defense of others"). So AEDPA deference applies. *See* 28 U.S.C. § 2254(d).

Under *Strickland v. Washington*, a petitioner bringing a claim of ineffective assistance of counsel must show (1) deficient performance and (2) prejudice to the defendant. *Knowles*, 556 U.S. at 124 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Counsel's performance is deficient where it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Further, when (as here) a petitioner raises an exhausted claim of ineffective assistance in a federal habeas petition, "[t]he pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

Upon consideration of testimony by Petitioner, trial counsel, and co-counsel at the post-conviction evidentiary hearing, the TCCA rejected Claim 2.G as follows:

> Both trial counsel and co-counsel agreed that Petitioner's statement [to Lt. Ambrose] could be used to benefit Petitioner by conveying his side of the story to the jury without risking the perils of cross-examination. Co-counsel testified that Petitioner expressed emotion during his statement that he believed would not be as effectively conveyed in his testimony at trial. The post-conviction court found that trial counsel and co-counsel discussed with Petitioner "the pitfalls of Petitioner testifying and the likely consequences of cross-examination." Petitioner agreed that the theory of third party defense would not survive cross-examination because, as trial counsel explained, they would have to overcome Petitioner having used more force than was necessary to eliminate the threat. Trial counsel believed that the State could prove premeditation if it was able to establish that Petitioner killed his sister to prevent her from having "unfettered access" to their parents. Trial counsel also explained that "everything [Petitioner] was going to testify to" was in Petitioner's statement to the police. This is exactly the type of "reasonable trial strategy" that we will not second guess. Trial counsel and co-counsel adequately considered the pros and cons of having Petitioner testify at trial. As such, we cannot conclude that trial counsel or co-counsel performed deficiently, nor can we conclude that Petitioner received ineffective assistance of counsel.

> Furthermore, Petitioner acknowledged that he made the ultimate decision not to testify in his defense. On cross-examination, Petitioner acknowledged that the trial judge questioned him about his understanding of his right to testify. Petitioner testified, "I knew I was waiving my right to testify." He testified, "I had no idea how critical it was." The evidence does not preponderate against the post-conviction court's finding that "at the time of trial, Petitioner concurred with defense counsel's ultimate advice that he not testify at trial." Petitioner is not entitled to relief on this ground.

*Naive*, 2018 WL 3814852, at *6.

This ruling was reasonable. The trial court conducted a *Momon* hearing[10] outside the presence of the jury to ensure that Petitioner's decision not to testify was knowing and voluntary. During this hearing, Petitioner testified under oath that he understood the rights he was giving up by not testifying, that the decision whether to testify was his, and that he had been advised on the advantages and disadvantages of testifying. (Doc. No. 11-10 at 47–48.) Petitioner then testified that he chose not to testify, free of any force. (*Id.* at 48–49.) This sworn testimony carries a strong presumption of truthfulness in subsequent proceedings. *See Cummins v. Phillips*, No. 1:16-cv-00023, 2017 WL 6554889, at *18 (M.D. Tenn. Dec. 22, 2017) (rejecting habeas petitioner's claim that counsel improperly influenced him not to testify based, in part, on petitioner's testimony during *Momon* hearing) (citing *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).

Petitioner nonetheless argues that "the only reason he waived [the right to testify] was because of his attorney's unprofessional advice not to" testify. (Doc. No. 16 at 14.) Consistent with this argument, at the evidentiary hearing, Petitioner testified that he and trial counsel planned for Petitioner to testify until four days before trial, when trial counsel advised him not to testify because trial counsel thought that Petitioner's trial testimony would "overshadow" the *Miranda*

---

[10] In *Momon*, the Tennessee Supreme Court held that a defendant's "waiver of the right to testify would not be presumed from a silent record and established a procedure to ensure that future records of trial proceedings would affirmatively demonstrate that a defendant personally waived his right to testify." *Quintero v. Carpenter*, No. 3:09-CV-00106, 2014 WL 7139987, at *72 (M.D. Tenn. Dec. 12, 2014) (discussing *Momon v. State of Tennessee*, 18 S.W.3d 152, 162 (Tenn. 1999)).

issue on appeal. (Doc. No. 11-23 at 14, 20–21, 42, 45–46.) Trial counsel and co-counsel, however, gave a different account: they testified that they talked to Petitioner about testifying, told him that they thought cross-examination would be damaging to his defense, and advised him not to testify. (*Id.* at 90–92, 101–02, 121–22.) Specifically, trial counsel believed that Petitioner's testimony would have harmed him because it would have been consistent with premeditation (assuming Petitioner testified truthfully). (*Id.* at 90.) According to trial counsel and co-counsel, Petitioner agreed with the advice not to testify and did not convey a desire to testify at trial at any point. (*Id.* at 100–01, 108, 122.)

The TCCA credited trial counsel and co-counsel's testimony on this subject, and this credibility finding is "entitled to great deference and must be sustained unless [it is] clearly erroneous, particularly in the context of AEDPA-limited habeas review." *Howell v. Hodge*, 710 F.3d 381, 386 (6th Cir. 2013) (internal citations and quotation marks omitted). Petitioner has not demonstrated that this credibility finding was clearly erroneous. And when crediting counsels' testimony on this point, it was reasonable for the TCCA to conclude that counsels' strategic advice for Petitioner to avoid a potentially damaging cross-examination by forgoing testifying fell within the wide range of reasonable professional assistance. *See Green v. MacLaren*, No. 17-1249, 2017 WL 3973956, at *2 (6th Cir. Aug. 2, 2017) ("[A] 'strategic decision cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness.'") (quoting *Miller v. Francis*, 269 F.3d 609, 615–16 (6th Cir. 2001); *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)). Accordingly, Claim 2.G will be denied.

C.    Procedurally Defaulted

Petitioner's remaining claims—Claims 1.A, 2.A through 2.F, and 3—are procedurally defaulted.

### 1.    *Claims 1.A and 3—Trial Court Error and Appellate Ineffectiveness*

In Claim 1.A, Petitioner asserts that the trial court was biased against him. (Doc. No. 1 at 16.) And in Claim 3, Petitioner asserts that he received ineffective assistance of counsel on direct appeal. (*Id.* at 13.) Petitioner did not present these claims to the TCCA on either direct or post-conviction appeal, and no state court remedies remain for doing so. *See* Tenn. Code Ann. § 40-30-102(c) (establishing Tennessee's "one-petition" limitation on post-conviction relief); *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (explaining the three narrow circumstances in which a Tennessee state prisoner may file a motion to reopen post-conviction proceedings, none of which apply to these claims) (citing *Fletcher v. Tennessee*, 951 S.W.2d 378, 380–81 (Tenn. 1997)). Accordingly, Claims 1.A and 3 are procedurally defaulted. *See Atkins*, 792 F.3d at 657 ("[W]hen a petitioner fails to present a claim in state court, but that remedy is no longer available to him, the claim is technically exhausted, yet procedurally defaulted.") (citing *Jones*, 696 F.3d at 483–84).

As "cause" to excuse this default, Petitioner argues that post-conviction counsel provided ineffective assistance and abandoned him. (Doc. No. 1 at 8, 10, 12, 14.) But as discussed above, post-conviction ineffectiveness can only excuse the default of claims of *ineffective assistance of trial counsel*, not claims of trial court error (as in Claim 1.A) or ineffective assistance of appellate counsel (as in Claim 3). *See Abdur'Rahman v. Carpenter*, 805 F.3d 710, 716 (6th Cir. 2015) ("*Martinez* applies only to claims of ineffective assistance of trial counsel, not trial errors . . . .") (collecting cases); *Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 827 (6th Cir. 2019) (recognizing the Supreme Court's decision not "to expand *Martinez* to procedurally defaulted

claims of ineffective assistance of appellate counsel") (citing *Davila*, 137 S. Ct. at 2066–67). And although attorney abandonment can constitute cause in certain circumstances, *see Maples v. Thomas*, 565 U.S. 266, 281 (2012), the record here is inconsistent with abandonment. Post-conviction counsel filed a post-conviction petition (Doc. No. 11-22 at 48–68), represented Petitioner at an evidentiary hearing (Doc. No. 11-23), and filed an appeal brief (Doc. No. 11-25) that the TCCA considered on the merits. *Naive*, 2018 WL 3814852. Petitioner may be dissatisfied with the quality of post-conviction counsel's representation, but post-conviction counsel did not abandon Petitioner. *See Young v. Westbrooks*, 702 F. App'x 255, 259–66 (6th Cir. 2017) (explaining that post-conviction counsel did not abandon petitioner where counsel filed appeal brief that was considered on the merits) (distinguishing *Maples*, 565 U.S. 266). Petitioner, therefore, has not established cause to excuse the default of Claims 1.A and 3, and these two claims are not subject to further review.

2. *Claims 2.A through 2.F—Trial Counsel Ineffectiveness*

In Claims 2.A through 2.F, Petitioner asserts that trial counsel provided ineffective assistance in six respective ways. Petitioner did not present these six claims to the TCCA on post-conviction appeal, and Petitioner can no longer raise them in state court. *See* Tenn. Code Ann. § 40-30-102(c); *Hodges*, 727 F.3d at 530 (citing *Fletcher*, 951 S.W.2d at 380–81). Accordingly, Claims 2.A through 2.F are procedurally defaulted.[11]

---

[11] In Claim 2.B, Petitioner asserts that trial counsel was ineffective for failing to interview Petitioner's parents before trial. In the Reply, Petitioner argues that this claim is not procedurally defaulted, because he raised it in the post-conviction petition through a general challenge to trial counsel's investigation and communication about "available witnesses," and because the post-conviction court heard testimony at the evidentiary hearing about counsel's decision not to interview Petitioner's parents. (Doc. No. 16 at 31–35.) But the post-conviction petition did not mention Petitioner's parents in its challenge to trial counsel's investigation, and the post-conviction court's order denying relief did not address the substance of Claim 2.B. (*See* Doc. No. 11-22 at 56–57 (post-conviction petition); Doc. No. 11-22 at 94–105 (memorandum and order denying relief).) Similarly, the post-conviction appeal brief raised two claims, neither of which can

Because Claims 2.A through 2.F are claims of trial counsel ineffectiveness that were not raised in Petitioner's post-conviction proceedings, an allegation of post-conviction ineffectiveness could conceivably provide a pathway to demonstrating "cause" to excuse their default under *Martinez v. Ryan*, 566 U.S. 1, 17 (2012). To excuse default under *Martinez*, several requirements must be met, including that the underlying claim is "substantial." *Abdur'Rahman*, 805 F.3d at 713 (quoting *Martinez*, 566 U.S. at 17). "A substantial claim is one that has some merit and is debatable among jurists of reason." *Id.* (citing *Martinez*, 566 U.S. at 14). "In the converse, a claim is insubstantial when 'it does not have any merit'" or "'is wholly without factual support.'" *Porter v. Genovese*, 676 F. App'x 428, 432 (6th Cir. 2017) (quoting *Martinez*, 566 U.S. at 15–16). As explained below, Claims 2.A through 2.F are insubstantial.

In Claim 2.A, Petitioner asserts that trial counsel did not represent him properly because counsel had a conflict of interest created by a lack of time to spend on Petitioner's case. (Doc. No. 1 at 11.) At the post-conviction evidentiary hearing, however, trial counsel testified that he met with Petitioner at the jail "20 to 30 times," and that each meeting lasted "at least an hour." (Doc. No. 11-23 at 86–87.) This was in addition to meeting with Petitioner "[e]very time [they] were in court." (*Id.* at 87.) Co-counsel similarly testified that he and trial counsel met with petitioner "in excess of 20 times," and that "[m]ost" of the meetings lasted "more than an hour." (*Id.* at 121.) Petitioner gave contradictory testimony (*id.* at 13 (testifying that they met 13 times—8 or 9 of which lasted 5 to 6 minutes, and 4 or 5 of which were substantive but still did not last "long periods

---

be fairly construed to encompass Claim 2.B, and the TCCA's opinion on appeal addressed just the two claims raised in the brief. (*See* Doc. No. 11-25 at 21–23 (asserting that trial counsel pursued an ineffective strategy and improperly advised Petitioner not to testify)); *Naive*, 2018 WL 3814852, at *1, 5–6. Petitioner, therefore, did not properly exhaust Claim 2.B in state court. *See Wagner*, 581 F.3d at 414–15 (explaining that proper exhaustion requires giving the state courts "the opportunity to see both the factual and legal basis for each claim") (citations omitted). Instead, because Petitioner failed to present this claim in state court and no state remedy remains available, Claim 2.B is "technically exhausted, yet procedurally defaulted." *See Atkins*, 792 F.3d at 657.

of time")), but the post-conviction court credited the testimony of counsel over Petitioner. (Doc. No. 11-22 at 104.) In the Petition and the Reply, moreover, Petitioner does not provide any supporting facts for Claim 2.A. Accordingly, Claim 2.A is a "conclusory allegation[] of ineffective assistance" that is "insufficient to state a constitutional claim." *Wogenstahl v. Mitchell*, 668 F.3d 307, 335 (6th Cir. 2012) (citing *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998)).

In Claim 2.B, Petitioner asserts that trial counsel was ineffective for failing to interview Petitioner's parents, who Petitioner claims would have substantiated the theory that Petitioner shot his sister to protect his father. (Doc. No. 1 at 12, 14–16, 18; Doc. No. 16 at 2, 7, 31–41.) Specifically, Petitioner argues that counsel should not have uncritically accepted the opinions of non-medical police officers that his parents had dementia. (Doc. No. 1 at 12; Doc. No. 16 at 36–39.) It is true that police officers responded to the scene of the shooting, spoke to Petitioner's parents, and concluded that Petitioner's parents could not provide a reliable account of the shooting due to diminished mental capacity. *See Naive*, 2013 WL 4505395, at *2 (Officer Twiford's trial testimony that he attempted to speak with Petitioner's parents, but these attempts "convinced [Twiford] that both were suffering from dementia or similar conditions"); (Doc. No. 23 at 133–34, 140 (Detective Colvin's evidentiary hearing testimony that Petitioner's father responded to questions about the shooting by "bounc[ing] back and forth between the events of that particular day, and something that occurred 40 years ago," that Petitioner's mother "was in much worse shape" than Petitioner's father, and that Petitioner's mother was "completely void of any reality or really any sense of knowing even where she was or what was occurring in general").) And it is true that trial counsel referenced a "police report" in his evidentiary hearing testimony when explaining that he did not interview Petitioner's parents because counsel believed it to be well-documented that "they had dementia." (Doc. No. 11-23 at 105.) But trial counsel testified that he

did not rely solely on a police report to reach this conclusion; counsel also spoke to Petitioner's brother, and Petitioner's brother agreed that "there[ was] just no talking to [Petitioner's parents]." (*Id.*) Overall, the record reflects that trial counsel made a reasonable decision that interviewing Petitioner's parents would not help Petitioner's defense. *See Kendrick v. Parris*, 989 F.3d 459, 471 (6th Cir. 2021) ("[T]he Sixth Amendment does not require an attorney to interview a witness personally when he reasonably believes that doing so is unnecessary.") (collecting cases). Claim 2.B, therefore, is without merit and insubstantial.

In Claim 2.C, Petitioner asserts that trial counsel should have obtained further testing of the victim to show that the victim "was still telling lies." (Doc. No. 1 at 11.) But Petitioner does not explain what kind of testing counsel should have obtained, what the testing would have shown, or the manner in which the victim had been allegedly untruthful. In other words, Claim 2.C is entirely unsupported by alleged facts, rendering it insubstantial. *See Wogenstahl*, 668 F.3d at 335 (citing *Workman*, 178 F.3d at 771).

In Claim 2.D, Petitioner asserts that trial counsel "made no attempts to defend" Petitioner, which "essentially left [him] without counsel all together[,] as stated in" *United States v. Cronic*. (Doc. No. 1 at 12.) In *Cronic*, the Supreme Court held that "a defendant can show a Sixth Amendment violation without the need to prove prejudice when there is a 'complete denial of counsel' at, or counsel is 'totally absent' from, a 'critical stage of the proceedings.'" *Clark v. Lindsey*, 936 F.3d 467, 470 (6th Cir. 2019) (quoting *Cronic*, 466 U.S. at 658–59 & n.25). Here, Petitioner does not specify the stage of the trial proceedings at which counsel was completely denied or totally absent. Moreover, Petitioner's conclusory allegation that counsel did not attempt to defend him is belied by the record, which reflects extensive pre-trial motion practice (including, but not limited to, filing three motions to suppress (Doc. No. 11-1 at 16–17, 33–34, 42–43)), an

attempt (albeit an unsuccessful one) to secure an expert opinion supporting a defense of diminished mental capacity (*see* Doc. No. 11-24 at 39–45), active questioning during the jury selection process (*see* Doc. No. 11-7 at 14–16, 18–19, 21–22, 73–94, 118–20), an opening statement at trial (Doc. No. 11-8 at 5–7), cross-examination of the State's trial witnesses (*id.* at 35–38; Doc. No. 11-9 at 29–48, 56–59, 91–106; Doc. No. 11-10 at 10–11, 33–35), calling a defense witness (Doc. No. 11-10 at 52–56), and a closing statement. (Doc. No. 11-11 at 59–67.) Because Petitioner has not shown that counsel was denied or absent during a critical stage of the proceedings, Claim 2.D is without merit and insubstantial.

In Claim 2.E, Petitioner asserts that trial counsel did not advise the court of the possibility that the jury may not have heard all of the evidence and been instructed on the applicable law, so "the court was unable to question the jury to determine if such misconduct had occurred in this case." (Doc. No. 1 at 11.) This claim is unsupported by any factual allegations, such as what evidence the jury may not have heard and what instruction may have been omitted or incorrect. During trial, moreover, the court instructed the jurors at least three times to wait until they had heard all of the evidence and instructions before beginning their deliberations. (Doc. No. 11-7 at 147–48; Doc. No. 11-8 at 85; Doc. No. 11-10 at 59–60.) Accordingly, Claim 2.E is a conclusory, insubstantial allegation of ineffective assistance. *See Wogenstahl*, 668 F.3d at 335 (citing *Workman*, 178 F.3d at 771).

Finally, in Claim 2.F, Petitioner asserts that trial counsel did not "engage in any litigation to suppress or exclude unlawfully obtained evidence that the State introduced at trial," including phone records, a voicemail message, facial drawings used for target practice, statements to police, and a remark during the State's closing argument. (Doc. No. 1 at 11–12.) Petitioner does not explain what "phone records" he is referring to here. And aside from those unspecific records,

counsel litigated each piece of evidence listed by Petitioner, by either filing a pre-trial motion or lodging an objection to its introduction at trial. (Doc. No. 11-1 at 33–34 (motion to suppress evidence seized from search of residence); Doc. No. 11-5 at 12–13 (suppression hearing testimony reflecting that evidence seized from the challenged search included facial drawings); Doc. No. 11-1 at 42–43 (motion to suppress statements); Doc. No. 11-1 at 61–62 (motion in limine to bar the State from referring to "any threats made to the deceased or bad acts of the defendant without a ruling on the admissibility"); Doc. No. 11-7 at 129–32 (counsel's argument reflecting that the motion in limine encompassed expected testimony about a threatening voicemail from Petitioner to the victim); Doc. No. 11-9 at 66–72 (jury-out hearing and counsel's objection to admissibility of testimony regarding voicemail); Doc. No. 11-11 at 68–69 (counsel's objection to State's closing argument).) Because counsel in fact did what Petitioner claims he should have done, Claim 2.F is meritless and insubstantial.

## VI. Conclusion

For these reasons, Petitioner is not entitled to relief under Section 2254, and this case will be dismissed. Because this is a "final order adverse to" Petitioner, the Court must grant or deny a certificate of appealability (COA). Habeas Rule 11(a). A COA requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition [is] denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it

debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 253 (6th Cir. 2017) (quoting *Slack*, 529 U.S. at 484).

For the reasons stated above throughout the Court's analysis, Petitioner has not satisfied this standard. Accordingly, the Court will deny a COA.

An appropriate Order is filed herewith.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE